Argued and submitted July 31, reversed and remanded October 22, 2014

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CHRISTINE ANN McCRARY,
*Defendant-Appellant.*

Yamhill County Circuit Court
MI110529; A152321

337 P3d 1008

Sarah Laidlaw, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney-in-Charge, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Ortega, Judge, and Garrett, Judge.*

DEVORE, P. J.

_____
* Ortega, J., *vice* Haselton, C. J.

## DEVORE, P. J.

Defendant appeals a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010, and reckless driving, ORS 811.140. Defendant raises assignments of error related to the trial court's direction that she submit to a test in court to check for a natural or resting nystagmus. She challenges a ruling that permitted the state to request an officer to perform the test during trial, an instruction to the jury stating that defendant did not have a constitutional right to refuse the test, and the denial of her motion for a mistrial after she refused to submit to the test. Among other things, defendant argues that the proposed test in court constituted an unconstitutional search, that the instruction was incorrect, and that to tell the jury that she refused the test violated her right against self-incrimination. Because we agree with the first two arguments, we need not reach the last one. We review a trial court's legal conclusions regarding the constitutionality of a search for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993); *State v. Coffer*, 236 Or App 173, 175, 234 P3d 1082 (2010). We reverse and remand.

The facts relevant to the appeal are undisputed. Just before 11:00 p.m., Officer Powell saw defendant run a red light and pull into a grocery store's parking lot. Defendant left her car and was walking toward the store when Powell confronted her. He noticed that defendant smelled moderately of alcohol and had glassy eyes. She admitted that she had been drinking beer recently at a couple of taverns and that she had started drinking at about 4:45 p.m. Defendant agreed to perform field sobriety tests (FSTs).[1] Before conducting the tests, Powell asked defendant whether she had any existing medical issues, and she did not report any eye-related disorders or problems. In the course of the tests, Powell administered a horizontal gaze nystagmus (HGN) test.[2] For that test, he instructed defendant to focus on a

---

[1] "Field sobriety test" is defined in ORS 801.272 as "a physical or mental test *** that enables a police officer or trier of fact to screen for or detect probable impairment from intoxicating liquor, a controlled substance, an inhalant, or any combination of intoxicating liquor, an inhalant and a controlled substance."

[2] Officers look for nystagmus, involuntary movement of the eye. There are three possible clues in each eye or a total of six possible clues. Four of six possible

stimulus held about a foot from a spot slightly above her eyes and to follow the movement of the stimulus without moving or turning her head. He observed four of six possible indicators of intoxication in the course of that test. Defendant fared poorly on other field sobriety tests, as well. Powell arrested defendant for DUII and brought her to the police station. An Intoxilyzer recorded her blood-alcohol content (BAC) as 0.12 percent.

At trial, Powell testified that he had administered "[h]undreds" of HGN tests and that, while conducting the test, it is standard practice to check for a resting or a natural nystagmus. He explained, "Some people have nystagmus * * * even when they haven't drank alcohol, it's slight but you can see it." Powell testified that he checked for a visible resting or natural nystagmus in the course of his investigation, as he does routinely in all similar investigations. To check for a resting or a natural nystagmus, Powell explained, he holds out a stimulus and observes the subject's eyes while the subject visually focuses on the stationary stimulus. During cross-examination, defense counsel questioned Powell about the omission of HGN testing procedure in his field notes, observing that his notes and the police report did not "contain any information about conducting the resting nystagmus [test]." On redirect, Powell testified again that he had checked defendant for the presence of any visible natural or resting nystagmus before conducting the rest of the HGN test. The state, nonetheless, asked Powell to check defendant at that time to see if she had a resting nystagmus.

Defense counsel objected to the state's request and, among other things, contended that a "[p]hysical characteristic not otherwise easily observable requires a warrant based on probable cause[.]" The trial court overruled the objection, advised that it could compel defendant to comply and indicated that, if defendant refused to allow Powell to look for a resting nystagmus, "that would be something [that the state] can comment on[.]"[3] The state repeated its request

"clues" must be present for an individual to fail the HGN test. *See* OAR 257-025-0020 (describing FSTs and procedure); *see also State v. O'Key*, 321 Or 285, 294-95, 899 P2d 663 (1995) (describing nystagmus and HGN test).

[3] The trial court offered defendant the chance to permit the test outside the presence of the jury but advised that the jury would still be told of the results of the test.

that defendant allow Powell to observe whether defendant had a visible nystagmus.[4] Defendant again objected, refused to submit to such observation, and moved for mistrial. The state asked that the court instruct the jury that defendant does not have a right to refuse the test. The court overruled defendant's objection in front of the jury, stating that "defendant doesn't have a constitutional right not to participate because it is not testimonial evidence. * * * However, I am not going to force her to participate in the evaluation." The court denied defendant's motion for mistrial.

On appeal, defendant assigns error to the trial court's ruling, arguing that the proposed test for a resting or natural nystagmus constituted a search, that the court could not lawfully compel defendant to submit to the test, and that the choice to either consent to the search or to refuse to consent before the impaneled jury amounted to a violation of her right against self-incrimination. The state responds that the court did not err in directing defendant to submit to the test because the test would not constitute a search insofar as defendant would not have been compelled to do an unusual act nor reveal information not otherwise available to the public. Since there was no search, in the state's view, there was no need for a warrant or an exception to the warrant requirement.[5] The state contends that, by refusing, defendant was not forced to incriminate herself, because defendant did not have a right to refuse the test.

Given that defendant's assignments turn on the premise that the courtroom test for a resting nystagmus constituted a search, we begin with that question. *State v. Delp,* 218 Or App 17, 22, 178 P3d 259, *rev den,* 345 Or 317 (2008) (whether a protected privacy right in a particular thing exists

---

[4] The trial court cautioned the prosecutor,

"I think I am right in my decision, otherwise I wouldn't be making it. On the other hand, it is an issue on appeal that may not be necessary for your case, which, it is up to you to assess the strength of [the state's] case. In other words, maybe this issue is not worth it, to put it in plain terms, because it will undoubtedly, if she is convicted, be an issue on appeal."

The prosecutor replied, "Your Honor, I consulted with the Department of Justice, and they told me to go forward * * *."

[5] The state does not argue, nor do we address, whether any exception to the warrant requirement applies or whether the court's order, in this context, was functionally equivalent to issuing a warrant.

is a legal, rather than factual, conclusion). We consider "the nature of the act asserted to be a search." *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988). Under Article I, section 9, of the Oregon Constitution, a search occurs when a government agent intrudes upon an individual's protected privacy interest.[6] *State v. Meredith*, 337 Or 299, 303-04, 96 P3d 342 (2004). Where no privacy interest is affected, no search has occurred. *State v. Barnum*, 136 Or App 167, 172, 902 P2d 95 (1995), *rev den*, 323 Or 336 (1996). "An individual either has a protected privacy interest or does not; the existence of such an interest does not depend on the reasonableness of the individual's subjective expectations in various circumstances." *Weber v. Oakridge School District 76*, 184 Or App 415, 426, 56 P3d 504 (2002), *rev den*, 335 Or 422 (2003). "The test to determine whether police conduct rises to the level of a search is whether the government's conduct would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Nagel*, 320 Or 24, 29, 880 P2d 451 (1994) (internal quotation marks omitted).

Consideration of field sobriety tests is instructive, even if not dispositive as to the lesser test at issue here. In *Nagel*, the Supreme Court concluded that administering FSTs constitutes a search for the purposes of the state and federal constitutions. 320 Or at 31, 36. The court explained that administering FSTs constitutes a search under Article I, section 9, because the tests require a defendant to perform, under an officer's observation, a number of "specialized and unusual acts designed to elicit information" that would not have been publically exposed but for the officer's directives and because such conduct impairs a privacy interest.[7] *Id.* at 31. The court concluded that, under the Fourth Amendment, the defendant had a reasonable expectation of privacy in the information gleaned from the field sobriety tests. An FST "may reveal evidence of * * * private facts about an individual, including whether the individual is illiterate, has Alzheimer's disease, or suffers from multiple sclerosis." *Id.* at 36.

[6] Article I, section 9, provides, in relevant part, that "[n]o law shall violate the right of the people to be secure * * * against unreasonable search, or seizure[.]"

[7] Accordingly, "an officer must have either a search warrant to conduct the tests or the authority to conduct them must come within one of the recognized exceptions to the warrant requirement." *State v. Rutherford*, 160 Or App 343, 346, 981 P2d 386, *rev den*, 329 Or 447 (1999).

The state's request to test defendant for a resting or natural nystagmus at trial is not summarily resolved by *Nagel*, because defendant was not accused of being under the influence of intoxicants at trial and the proposed lesser test was not equivalent to conducting a field sobriety test in its entirety. *See State v. Fish*, 321 Or 48, 58, 893 P2d 1023 (1995) (FSTs are "designed to elicit responses that demonstrate whether the individual is under the influence of intoxicants"). Therefore, we must ask whether the nature of the proposed test—observing defendant's eyes while she focused her gaze on a stimulus held approximately one foot away from her face for several seconds—would significantly impair a privacy interest.

Privacy interests are not implicated where the nature of the evidence is the type of physically identifying information about a person that is displayed in public, such as a person's voice or handwriting. *Barnum*, 136 Or App at 173 (order to compel a standard handwriting exemplar not a search); *State v. Davie*, 56 Or App 507, 517 n 5, 642 P2d 680, *rev den*, 293 Or 146 (1982) ("A court may order a person to speak to demonstrate his voice for purposes of identification."). *But see Nagel*, 320 Or at 34-35 (behavior not regularly displayed in public includes reciting the alphabet, counting backward, standing on one leg while counting forward, and counting steps while walking in a straight line forward and backward). A search does not occur in readily apparent observations of an individual's physical appearance. Officers routinely make objective observations about a suspect's physical appearance in the course of an investigation, often resulting in reasonable suspicion of intoxication. *State v. Cottrell*, 215 Or App 276, 280-81, 168 P3d 1200, *rev den*, 343 Or 554 (2007) (citing objective facts permitting officer to reasonably suspect intoxication). A review of cases involving alcohol demonstrates observations such as watery and bloodshot eyes, incoherent and slurred speech, and the presence of pungent odors. *See, e.g., id.* at 280 (defendant had bloodshot, watery eyes, odor of alcohol on breath, and demonstrated "inattentive and messy eating"). To constitute a search, the examination requires something more than observation of a physical characteristic that a person plainly manifests to the public.

Individuals have an interest in keeping "certain aspects of their physical * * * condition private." *Nagel*, 320 Or at 31. A privacy interest exists in many conditions of the body, and, if an officer's examination of a defendant reveals a physical and psychological condition that is not otherwise observable by the officer or to the public, then that examination may well constitute a search. Such is the case, for example, with one's pulse or the content of one's breath, blood, and urine. *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988) (blood extraction is a search); *Weber*, 184 Or App at 427 (urine test of student athletes is a search); *State v. Stowers*, 136 Or App 448, 453, 902 P2d 117 (1995) ("a person's pulse is private" and taking pulse allows examination of "aspects of [a] defendant's physical and psychological condition that were not otherwise observable"); *State v. Osburn*, 13 Or App 92, 94, 508 P2d 837 (1973) (blood-alcohol test is a search). From those examples, a common principle is apparent: Some examinations "may reveal a host of medical facts," and none of that information, "to put it plainly, is the public's business if the individual does not want it to be." *Weber*, 184 Or App at 427.

We conclude that testing for a resting or natural nystagmus constitutes a search. The state's request, here, would have required defendant to focus on a stimulus, held for a number of seconds at approximately one foot from her face, in order to reveal whether her eyes manifested an involuntary twitching or jerking movement. Without proper administration of the test, as Powell testified, "the test may not work properly, and you might not see the nystagmus even though it could be there." Given the necessity of a test, however brief, to reveal the presence of a natural or resting nystagmus, the condition is not a physical characteristic that is plainly manifested to the public. The test would require defendant to engage in conduct, a focused gaze on a fixed point from her face, that would allow Powell "to detect certain aspects of defendant's physical * * * condition that [was] not detectable through simple observation" from his station in a public courtroom. *Nagel*, 320 Or at 30.

Nystagmus is not an observation that is made or understood as a matter of common knowledge. *State v. O'Key*, 321 Or 285, 297, 899 P2d 663 (1995) ("relationship

between the effects of alcohol on the central nervous system, the nystagmus phenomenon, and the HGN test is not within the realm of common knowledge of the average person"); *see State v. Clark,* 286 Or 33, 39-40, 593 P2d 123 (1979) (taking judicial notice of a list of commonly known "observable symptoms or 'signs' of alcohol intoxication," which does not include nystagmus). Revealing the presence of nystagmus implicates the potential medical facts that an individual may well wish to keep private. As Powell testified, natural or resting nystagmus is present in a small percentage of individuals, and it is standard procedure to rule out an existing medical cause of nystagmus before administering a complete HGN test. The Supreme Court has observed that examples of causes of nystagmus not induced by alcohol "include caffeine, nicotine, eyestrain, motion sickness, epilepsy, streptococcus infections, measles, vertigo, muscular dystrophy, multiple sclerosis, influenza, hypertension, sunstroke, changes in atmospheric pressure, and arteriosclerosis."[8] *O'Key,* 321 Or at 312-13 (citing Comment, *Can Your Eyes be Used Against You? The Use of Horizontal Gaze Nystagmus in the Courtroom,* 84 J Crim L & Criminology, 203, 212 (1993)). Such information falls within a privacy interest protected by Article I, section 9. *See, e.g., Weber,* 184 Or App at 427 (urine can reveal "whether an individual is diabetic, epileptic, or—in the case of a woman—pregnant"). Insofar as this search was to be imposed upon defendant without a warrant or without an exception to the warrant requirement, the search would have been unconstitutional.

Having concluded that this test would constitute an unlawful search, we must also conclude that the court erred by advising the jury that defendant had no right to refuse to cooperate in the examination. The midtrial instruction was mistaken. *State v. Powell,* 74 Or App 334, 337, 703 P2d 257 (1985) (erroneous jury instruction is not harmless unless "there is substantial and convincing evidence of guilt and that the error committed was very unlikely to change the result of the trial"). Because those errors are not harmless,

---

[8] In support of defendant's objection at trial, an expert similarly testified that resting nystagmus can be caused by "pathological disorders, brain diseases which account for a chemical imbalance, or either tumors or head injuries which cause pressure in the brain * * *[affecting] the optic nerve."

they are dispositive, and we do not need to address defendant's argument that to tell the jury of her refusal violated her right against self-incrimination under Article I, section 12, of the Oregon Constitution. Nor do we need to address defendant's motion for a mistrial.

The errors were not harmless despite the state's contention that the state had provided evidence of a *per se* DUII violation. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (error is harmless if there is little likelihood that it affected the verdict). The state presented evidence at trial in support of two theories upon which the jury could find defendant was guilty of DUII, in violation of ORS 813.010.[9] First, the state presented evidence that defendant's BAC was 0.12 percent. Defendant, however, attempted to raise doubt as to the validity of that evidence by impeaching the reliability or functionality of the Intoxilyzer machine. Second, the state proffered evidence of defendant's intoxication through Powell's testimony regarding defendant's performance on various FSTs. Defendant, however, attempted to raise doubt as to Powell's compliance with standard procedure in administering the HGN test. Thus, the jury was offered two alternative theories under which it could find guilt, pursuant to ORS 813.010: (1) a BAC exceeding 0.08 percent, or (2) a finding that defendant was under the influence of alcohol. As this court has observed, "jury verdicts are inscrutable." *State v. Painter*, 255 Or App 513, 523, 300 P3d 179 (2013). We cannot determine which theory the jury accepted in arriving at its finding of defendant's guilt, and, therefore, we cannot conclude that the jury relied on the state's theory of defendant's BAC. The prejudicial effect of the court's ruling was the adverse inference that the jury could draw from the court's instruction and defendant's refusal. *See Fish*, 321 Or at 56; *see also State v. Garner*, 234 Or App 486, 493, 228 P3d, *rev den*, 353 Or 280 (2010) (observing prejudicial effect of prosecutors' comment in opening argument that the defendant refused to perform FSTs). Given the alternative theories of defendant's guilt, and the prejudice arising from

[9] ORS 813.010 provides, in part, that a person commits DUII if the person "[h]as 0.08 percent or more by weight of alcohol in the blood *** as shown by chemical analysis of the breath or blood," *or* "[i]s under the influence of intoxicating liquor[.]"

the court's ruling, we cannot venture that there was "little likelihood" that the error affected the verdict.

In light of these conclusions, we reverse and remand.

Reversed and remanded.